**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
**JOHN DOE,**

                 **Plaintiff,**

    **-against-**

**MANHATTAN COLLEGE,**

                 **Defendant.**
-------------------------------------------------------X

            **Civil Action No:**

            **COMPLAINT**

            <u>**JURY TRIAL DEMANDED**</u>

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his complaint against Defendant Manhattan College ("Defendant" or the "College"), respectfully alleges as follows:

<u>**THE NATURE OF THE ACTION**</u>

1.    This action arises out of the egregious, biased, intentional, and discriminatory actions taken by Manhattan College against Plaintiff throughout the College's Title IX sexual misconduct process, which included procedural and substantive errors that resulted in an erroneous finding of responsibility and ultimately, Plaintiff's wrongful expulsion from the College.

2.    Manhattan College conducted an investigation and hearing process bereft of fairness as a consequence of false allegations of sexual misconduct brought against Plaintiff by fellow student, Jane Roe[2]. In investigating and adjudicating the false allegations against Plaintiff, Manhattan College deprived him of basic fairness when it conducted a disciplinary process that was neither thorough nor impartial, exhibited a gender bias against Plaintiff as the male accused, and deprived him of his right to a fair proceeding.

---

[1] Plaintiff has filed a motion herewith to proceed by pseudonym.
[2] Jane Roe is a pseudonym.

3.     A non-exhaustive list of Manhattan College's wrongful conduct includes the following: (i) failing to provide Plaintiff with a notice of the allegations against him; (ii) failing to timely provide Plaintiff with proper notice of his right to an advisor; (iii) interviewing Plaintiff without an advisor and without providing notice of the allegations; (iv) failing to ask Roe questions that would negatively affect her credibility, such as those pertaining to her actions that indicated clear consent to sexual activity with Plaintiff; (v) permitting the Title IX Coordinator to prejudice the Hearing Panel; (vi) failing to properly apply the preponderance of the evidence standard given the lack of evidence in the case and Roe's conflicting statements; (vii) failing to address Roe's retaliation and witness tampering; (viii) improperly equating intoxication with incapacitation in violation of the College's Title IX Policy; (ix) failing to allow Plaintiff to submit an impact statement prior to issuing sanctions; and (x) reversing the Appeal Determination without any grounds in the Policy for doing so.

4.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

5.     Plaintiff is a natural person and a resident of the state of Pennsylvania. During the events described herein, Plaintiff was enrolled as a fulltime, tuition-paying, undergraduate student at Manhattan College.

6.     Defendant Manhattan College is a private Catholic College in Bronx, New York, where it maintains its principal offices and place of business.

7.     At all times relevant to this Complaint, Manhattan College received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX"). In 2020, Manhattan College received approximately $933,093 in government grants.[3]

## JURISDICTION AND VENUE

8.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Defendant is a citizen of the state of New York, and at the time of the events described herein Plaintiff was a citizen of the state of Pennsylvania; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

9.     This Court has personal jurisdiction over Defendant Manhattan College on the ground that it is conducting business within the State of New York.

10.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.     Background: The Effect of the "April 2011 Dear Colleague Letter" of the Department of Education's Office for Civil Rights on University Sexual Misconduct Policies**

11.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of Education,          Dear          Colleague          (Apr.          4,          2011),

---

[3] *See President's Report*, Manhattan College (2020), available at https://manhattan.edu/about/leadership-governance/president-office/president-annual-report.php.

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

12.     While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra*, at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, limiting cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id.* at 8.

13.     In a related guidance document published on April 29, 2014, the U.S. Department of Education, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (hereinafter "2014 Q&A"), OCR advised schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *id.* at 31, and persons implementing schools' grievance procedures should be trained on "the effects of trauma, including neurobiological change," *id.* at 40.

14.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

15.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to

Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigations, compliance review, and/or litigation against schools suspected of violating Title IX.

16. In June 2014, the DOE's Assistant Secretary for Civil Rights, Catherine Lhamon, testified before the United States Senate that if OCR could not secure voluntary compliance with its Title IX guidance from a college or university, the agency could initiate administrative action to terminate federal funds or refer the case to the Department of Justice. *Sexual Assault on Campus: Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. (2014) (statement of Catherine E. Lhamon, Assistant Sec'y, Office for Civil Rights, U.S. Dep't of Educ.).

17. Over the past decade, universities across the country, including Manhattan College, have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016).

18. To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited February 27, 2023).

19. On September 22, 2017, OCR rescinded its 2011 DCL and its 2014 Q&A and noted that the agency had been widely criticized for putting "improper pressure upon universities to

adopt procedures that do not afford fundamental fairness." U.S. Department of Education, *Dear Colleague* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (quoting Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, Wall St. J. (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf).

20.     As former Secretary of Education Betsy Devos noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

21.     The OCR issued an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (hereinafter "2017 Q&A"), while the agency conducted a rulemaking process that would eventually lead to binding Title IX rules. The 2017 Q&A, which was in effect during the events at issue in this Complaint, required that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

22.     On May 6, 2020, the Department of Education released its final regulations on Title IX, which went into effect on August 14, 2020. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106). The regulations make clear, inter alia, that schools can be found to have discriminated on the basis of sex by treating either the complainant or the Plaintiff

unfairly; that parties must be provided access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that the parties are entitled to a live hearing with cross-examination; that Plaintiffs must be presumed not responsible; that all relevant evidence must be evaluated objectively; and that investigators and decisionmakers must receive non-biased training, and may not rely on sex stereotypes.

23.     The DOE launched a "comprehensive review" of the current Title IX regulations on April 6, 2021, in response to President Joseph Biden's March 8, 2021 Executive Order, *Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity*, see https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf.

24.     On June 23, 2022, the DOE released their proposed changes to the Title IX Regulations. U.S. Department of Education, *The U.S. Department of Education Releases Proposed Changes to Title IX Regulations, Invites Public Comment* (June 23, 2022), https://www.ed.gov/news/press-releases/us-department-education-releases-proposed-changes-title-ix-regulations-invites-public-comment.

25.     On information and belief, Manhattan College implements its sexual misconduct policies in a manner intended to protect women, and endeavors to find male accused students responsible and punish them harshly, in order to avoid any institutional harm resulting from bad media attention and/or a possible loss of federal funds pursuant to an OCR investigation.

26.     On information and belief, Manhattan College's institutional self-interest in avoiding further bad press and student outrage resulted in an inherent gender bias which directly affected Plaintiff's case, leading to an erroneous finding, and an unwarranted expulsion.

## II.     Manhattan College Has Been Scrutinized For its Handling of Sexual Assault Allegations

27.     Following a break-in to the College's dormitories in 2020 that made headlines and resulted in two female students reporting they were sexually assaulted, and a viral social media campaign involving several woman accusing a Manhattan College student of sexual assault, the College has faced backlash for its response to these events. See https://abc7ny.com/rape-attempted-sexual-assault-police/5955979/                                     and https://www.hercampus.com/school/manhattan/im-upset-way-mc-handling-sexual-assault/.

28.     On December 15, 2022, ten days after Plaintiff's Title IX Hearing and baseless arrest, and three days prior to the Outcome Letter in Plaintiff's matter, an article was published by Roe's sorority sister at the College criticizing the College's handling of sexual assaults. https://www.hercampus.com/school/manhattan/we-need-to-improve-how-sexual-assaults-are-handled-on-college-campuses/.

29.     On information and belief, this letter impacted the College's handling of Plaintiff's Appeal and prompted the College to go against its policies, overturn its initial appeal decision accepting Plaintiff's appeal, and reopen the appeals process to allow Roe an opportunity to oppose Plaintiff's appeal.

30.     On information and belief, this letter influenced the College's decision denying Plaintiff's appeal on reconsideration in fear of further backlash from students on campus for the College's failure to punish males accused of sexual assault.

31.     On information and belief, given the recent headline-making scandals brought forth by women on campus against men, Manhattan College has taken a hardline approach on males accused of sexual misconduct in order to prove that the College takes sexual misconduct matters seriously.

32.     Additionally, Manhattan College administrators, including those directly involved in Plaintiff's case, have demonstrated victim-centered approaches to sexual misconduct. Indeed, Erika J. Pichardo ("Pichardo"), the College's Title IX Coordinator, has given presentations on "Understanding Sex Versus Gender in Victim-Centric and Trauma-Informed Work." *See* Erika J. Pichardo, Linkedin, available at  https://www.linkedin.com/in/erika-j-pichardo-ph-d-b4a737a7; *see also* Speakers & Presenters, SUNY Events, available at https://www.suny.edu/events/spectrum/speakers/ ("As an ally to the LGBTQIA+, neurodivergent, and underserved communities, she prides herself on increasing education, prevention, and awareness around victim-centered and trauma-informed approaches.").

### III.     Plaintiff's Background

33.     Plaintiff matriculated to Manhattan College in August 2019 with an expected graduation of May 2023.

34.     Plaintiff has been a model student and community member throughout his three and a half years at the College. Academically, he received numerous honors, becoming inducted into multiple honors societies and receiving numerous prestigious scholarships throughout his time at Manhattan College. Plaintiff has made the Dean's Honors List for all seven consecutive semesters at the College and has authored multiple peer-reviewed history publications.

35.     Plaintiff was also selected as a Fulbright Study/Research Semi-Finalist. It is very likely that Plaintiff would have been awarded the Fulbright Fellowship but for the actions of the College, as there are fourteen final applicants for ten positions.

36.     Additionally, Plaintiff prepared a substantial project that will be considered for the prestigious Fulbright National Geographic Storytelling Fellowship.

37.     Plaintiff is applying to masters and doctorate programs in History. Plaintiff will be robbed of his academic and economic future as a result of being erroneously found responsible for sexual assault.

## IV.     Plaintiff and Roe's Encounter

38.     Prior to the events described herein, Plaintiff and Jane Roe were friends for approximately two years and maintained a cordial relationship.

39.     Plaintiff and Roe met in their Arabic class during the 2019-2020 school year, when classes were held remotely due to the COVID-19 pandemic.

40.     Plaintiff and Roe then became friends when classes resumed in person during the 2021-2022 school year.

41.     On the night of September 1, 2022, Plaintiff went to a local bar, Fenwick's, with a few friends.

42.     When Plaintiff arrived at Fenwick's, Roe was also at the bar with her friends.

43.     When Plaintiff and Roe saw each other at the bar, they engaged in friendly conversation.

44.     Roe spoke with Plaintiff in a flirtatious manner, leaning in closely to speak to him, and touching his arms and torso during conversation.

45.     Plaintiff and Roe then began to dance with each other while at the bar.

46.     Both Plaintiff and Roe had been drinking while at the bar. However, neither Plaintiff nor Roe were intoxicated to the point of incapacitation.

47.     Plaintiff then asked Roe if she would like to have sex with him that night, and Roe said yes.

48.     Roe, after telling Plaintiff that she wanted to have sex with him, told Plaintiff that she loved him and that she would make an "exception" regarding her sexuality for him as Roe was lesbian.

49.     Roe then, *after* telling Plaintiff that she wanted to have sex with Plaintiff, bought Plaintiff another vodka soda, which they each consumed half of.

50.     At no point during the night did Plaintiff buy any drinks for Roe.

51.     Throughout their encounter at the bar, Roe was coherent, alert, did not slur any words, did not stumble, and did not exhibit any other signs of intoxication.

52.     At approximately 2:00 A.M., Roe and Plaintiff left the bar together and went to Witness J.R. [4]'s house (the "Frat House").

53.     When Plaintiff and Roe arrived at the Frat House, Roe had a few sips of a White Claw.

54.     While at the Frat House, Roe did not exhibit any signs of intoxication.

55.     Indeed, Plaintiff knew that Roe was not intoxicated, because Plaintiff *had* observed Roe while she was intoxicated on three separate prior occasions. By way of example, and not limitation, Plaintiff knew when Roe was intoxicated because:

      a.  Roe texted Plaintiff when she had a bottle of vodka in her room and drank a lot of it and was sick and crying in the spring of 2022;

      b.  Plaintiff saw Roe more intoxicated at a sorority mixer when she was falling over; and

      c.  On one occasion Plaintiff observed Roe having to be carried home after she consumed alcohol.

---

[4] Plaintiff is using initials to protect the anonymity of witnesses.

56.     While at the Frat House, Plaintiff did not see Roe vomiting, falling down, slurring her words or acting in any other manner that would indicate that she was incapacitated or otherwise unable to give consent to sexual activity.

57.     Witnesses J.B. and J.R. were also present at the Frat House. Neither J.B. nor J.R. saw Roe falling over, vomiting, or speaking incoherently while at the Frat House.

58.     At the Frat House, Plaintiff and Roe cuddled on a recliner together with Plaintiff's arm around Roe's waist, in front of J.R. and J.B.

59.     Plaintiff then asked Roe if she wanted to go outside to "make out" (kiss), and Roe said yes.

60.     Plaintiff and Roe then went to the back porch at the Frat House and consensually kissed on the patio furniture.

61.     Roe then asked Plaintiff if she could perform oral sex on Plaintiff.

62.     Plaintiff declined Roe's offer, however, because other people were present at the Frat House and would be able to see.

63.     After Plaintiff declined Roe's offer, they went back inside the Frat House.

64.     While inside, Plaintiff asked Roe if she wanted to go to her apartment to have sex, and Roe said yes.

65.     Plaintiff and Roe then left the Frat House and walked back to Roe's apartment.

66.     Roe walked upright and never stumbled. Plaintiff had never been to Roe's apartment before, and did not know where her apartment was located. Roe was alert, coherent, and was able to navigate them back to her apartment with no issue.

67.     When they arrived at Roe's apartment, Roe voluntarily led Plaintiff by the hand into her apartment.

68.     At Roe's apartment, Roe and Plaintiff began mutually kissing again on Roe's bed.

69.     Plaintiff and Roe then removed their clothes and kissed naked on Roe's bed.

70.     Roe never told Plaintiff that she did not want to continue or pushed Plaintiff away.

71.     Plaintiff asked Roe if he could perform oral sex on her, and Roe said yes.

72.     Plaintiff performed oral sex on Roe, and she was grabbing Plaintiff's hair while he did so, indicating that she was an active and willing participant in the encounter.

73.     Roe and Plaintiff continued kissing, and prior to penetration, Plaintiff asked Roe if it was ok to continue, and Roe said "okay."

74.     Plaintiff asked Roe if she was sure, and she said "okay."

75.     Roe never said no, resisted, or pushed Plaintiff away in any manner.

76.     Roe and Plaintiff then had consensual sex.

77.     Afterwards, Plaintiff fell asleep in Roe's bed while cuddling with Roe.

78.     After the sexual activity, while Plaintiff was sleeping, Roe called her sorority sister, J.B., via Instagram and asked if she was still at the Frat House. *Roe did not indicate anything regarding sexual assault while on the call*.

79.     Roe then returned to the Frat House about 30 minutes later, where J.R., J.B., and two other men were. When Roe returned to the Frat House, Roe's demeanor was completely normal, and Roe was not crying.

80.     Roe then asked J.B. to kiss her, but J.B. declined to kiss Roe.

81.     *After* Roe's advances towards J.B. were declined, Roe's mood changed.

82.     After Roe grew visibly upset and emotional, J.B. comforted Roe.

83.     When J.B. asked what was wrong, Roe told J.B. that "something" happened with Plaintiff sexually, and that Roe said no and asked Plaintiff to stop, but Plaintiff refused.

84.     On information and belief, Roe, who only grew upset and emotional after J.B. refused Roe's advances, was upset and embarrassed about her encounter with J.B., and falsely accused Plaintiff of sexual assault to get J.B.'s sympathy.

85.     J.R. and another man then went to Roe's apartment and woke up Plaintiff, who was still asleep in Roe's room.

86.     Plaintiff then woke up and returned to his home on his own.

87.     Plaintiff did not remember being woken up or getting to his apartment.

88.     It was uncommon for Plaintiff to not remember events due to being drunk.

89.     Plaintiff did not feel well the next day from the alcohol.

90.     The next day, Plaintiff texted Roe to see how she was feeling given that they had sex and had been friends beforehand.

91.     To Plaintiff's complete shock and surprise, Roe accused Plaintiff of sexual assault, and stated that she went to an urgent care center, City MD, at 6:30AM and was given a urine test.

92.     Plaintiff was stunned by Roe's allegations, given that Roe had exhibited complete consent during their sexual encounter. Plaintiff would not have engaged in sexual contact with Roe had Roe said no in any manner.

**V.      Manhattan College Investigates Plaintiff Based on Roe's Unfounded Allegations**

93.     The following day, Roe saw a friend who took her to the Title IX office. Roe submitted a formal complaint of sexual assault against Plaintiff.

94.     Roe's complaint claimed that she had been forcibly sexually assaulted by Plaintiff, despite her resistance. Notably, Roe's complaint made no mention of being incapacitated and therefore unable to consent.

95.     Shockingly, after Roe made her complaint, *Plaintiff was never given a Notice of Allegations*.

96.     Instead, Plaintiff was first made aware of the Title IX Complaint via an email from Defendant's Chief Compliance Officer of the Office of College Compliance and Ethics, Goldie Adele ("Mr. Adele"), on September 12, 2022, which stated: "At this time, you are being interviewed regarding an alleged violation of our Title IX Policy… It is the College's understanding that the alleged incident of Sexual Assault occurred on 9/2/22."

97.      Mr. Adele's email failed to include the time, location or any detail regarding the factual allegations underlying the complaint.

98.     On September 14, 2022 Plaintiff was interviewed by two of Manhattan College's investigators, Michael Steele ("Steele") and Juanita Pacheco ("Pacheco"), without ever having received a proper Notice of Allegations or receiving any details regarding the code of conduct provisions he was alleged to have violated.

99.     Plaintiff was interviewed without an advisor present.

100.    No one from Manhattan College informed Plaintiff about the role of an advisor or gave him notice of the possible sanctions involved.

101.    Without an advisor, or proper guidance on his right to have an advisor, Plaintiff was forced to navigate his sole interview uninformed as to the allegations against him and the Title IX process in general.

102.    After his interview, Plaintiff provided the Title IX investigators with a written statement regarding his recollections from September 2, 2022.

103.    Plaintiff consistently maintained that the sexual activity was consensual, and that Roe was not incapacitated at any point during their sexual encounter.

15

104.   Roe's allegations, however, were inconsistent and entirely disproved by her own witnesses throughout the Title IX investigation. By way of example, and not limitation:

      a.   According to Roe, she demonstrated her non-consent to sexual activity with Plaintiff by "shaking her head no." Plaintiff, however, *never* saw Roe shake her head at any point during the encounter. Instead, Roe was a consenting participant throughout the sexual encounter.

      b.   According to Roe, when she returned to the Frat House, she was "crying a lot." However, J.R., who was present when Roe returned, testified that Roe seemed completely fine, and that her attitude appeared the same as earlier in the night.

      c.   According to Roe, she was extremely intoxicated to the point of incapacitation. Plaintiff, however, described that he had seen Roe intoxicated on several prior occasions, and that here actions on the night of their encounter did not exhibit any visible signs of intoxication. Additionally, J.B. and J.R. both testified that Roe was not falling over vomiting, or speaking incoherently, and did not appear overly drunk.

105.   Despite the inconsistencies in Roe's story, the Title IX investigators failed to ask Roe any follow-up questions other than the names of two witnesses.

106.   Further, the Title IX investigators failed to ask Roe any probing questions to discern the credibility or logic of Roe's account.

107.   The Title IX investigators also did not ask Roe about her *consensual* "making out" with Plaintiff prior to sexual activity.

108.   On information and belief, the Title IX investigators avoided asking any questions which could undermine Roe's allegations or credibility as the female accuser, and sought to paint a story to have Plaintiff found responsible as the male accused.

109.   Plaintiff finally received a copy of Roe's Title IX Complaint on October 27, 2022, over a month and a half after Plaintiff had already been interviewed by the investigators.

110.   Worse, the Investigation Report that was produced by the College was devoid of any substantial information, reasoning, or facts.

111. Indeed, the Investigation Report was contained in a single, 15-page word document, which merely pasted the link to the interviews of Plaintiff, Roe, and two of Roe's witnesses.

112. The Investigation Report did not do so much as to even provide a factual summary of the events. Indeed, the "executive summary" was contained in a single sentence, which merely stated that Roe accused Plaintiff of sexual assault while in Roe's apartment.

113. The Investigation report provided no meaningful opportunity for Plaintiff to analyze the evidence and testimony which was to be used against him at the hearing.

114. Therefore, the bare Investigation Report deprived Plaintiff of a meaningful opportunity to formulate a defense.

115. Additionally, despite Roe's claims that she went to an urgent care center the next day, *no medical records from a physicians, psychiatrist, psychologist or other medical provider for Roe were included or referred to in the Investigative Report.*

## VI. The Title IX Coordinator Failed to Appropriately Deal with Acts of Retaliation by Roe to the Detriment of Plaintiff

116. While the Title IX investigation was ongoing, Roe's mother came to the College approached individuals on campus, asked if they were Manhattan College students and when they said they were, handed them cards stating, "[Plaintiff] is a Rapist."

117. These cards were also left in various locations throughout student housing.

118. The cards were clearly meant to penalize Plaintiff, who was involved in a Title IX investigation.

119. The cards were also meant to threaten or intimidate any potential witnesses.

120. On September 23, 2022 Plaintiff emailed Mr. Adele describing the acts of retaliation he experienced including the distribution of cards stating that he was a rapist.

121.     Plaintiff emailed Mr. Adele the names of witnesses who saw the cards around campus and who observed Roe's mother distributing the cards.

122.     Incredibly, Plaintiff's emails were ignored.

123.     Several weeks after the September 23rd email, Plaintiff and his advisor met with Mr. Adele via Zoom.

124.     Mr. Adele stated to both Plaintiff and his advisor that since the cards were left "off campus" there was nothing that could be done about the issue.

125.     Further, prior to the hearing, Plaintiff and his advisor informed both Mr. Adele and Ms. Pichardo that at least one witness, R.S., had been intimidated by Roe to prevent her from testifying as a potential witness in the Title IX hearing.

126.     R.S. told Plaintiff and his advisor that she was afraid to speak out against Roe, and that Roe had discovered that she had spoken to Plaintiff regarding Roe's allegations.

127.     R.S. even expressed her willingness to help Plaintiff with what she knew, but only after R.S. graduated from the school due to her fear of Roe.

128.     Roe intimidated R.S. after Roe learned that R.S. might provide exculpatory testimony for Plaintiff.

129.     After hearing about Roe's retaliation, Mr. Adele *initially attempted to blame Plaintiff and his advisor for "investigating Roe's claims,"* stating that the investigation of the events had been completed by the investigators and no further investigation was necessary.

130.     Mr. Adele then retracted those comments but did nothing to rectify Plaintiff's concerns.

131.     Manhattan College did not contact the witness and did nothing to ensure that future harassment would not occur.

132.    The College further failed to do anything at all to ensure that individuals who took part in the investigation and hearing process did not experience retaliation.

133.    As a result of Roe's threats, R.S. did not participate in the hearing.

134.    Plaintiff's advisor also informed Mr. Adele that J.B., one of the witnesses who participated in the hearing told Plaintiff's advisor: "I'm gonna go with the girl if she says something happened even if it is not true".

135.    Yet, the College did not investigate the veracity of the witness' testimony or even probe her.

**VII.    The Title IX Coordinator Prejudiced the Hearing Panel's Decision-Making Process**

136.    The Title IX Hearing was held on December 5, 2022.

137.    Throughout the Hearing, Roe contradicted both her own statements and those of her witnesses.

138.    Immediately after completion of the hearing, Plaintiff and his advisor were seated at a table in Room 3B of Kelly Commons in Manhattan College. The three members of the Title IX Hearing Panel were seated at the same table as Plaintiff and his advisor, approximately five feet away.

139.    Mr. Adele then approached Plaintiff and his advisor and in earshot and in plain view of the Hearing Panel told Plaintiff, at a volume loud enough for anyone in the room to hear, that Public Safety Officers requested to see him.

140.    When Plaintiff's advisor asked what the meeting was about, Mr. Adele stated "about this," and pointed his hands around the room, referring to the Hearing that had just occurred.

141.    Mr. Adele then again stated that Public Safety Officers were requesting to meet with Plaintiff, within five feet of the hearing panel and loud enough for anybody in the room to hear.

142.    Plaintiff's advisor then asked Mr. Adele to step out of the room to talk.

143.    Plaintiff became visibly upset by Mr. Adele's statements inside the hearing room, as it was clear to Plaintiff that Mr. Adele's announcement in the room meant that Safety Officers were either seeking to question Plaintiff or arrest him for the allegations referred to in the Hearing.

144.    Plaintiff and his advisor went with Mr. Adele to a side office directly adjacent to the Hearing room, and his advisor asked Mr. Adele why he did not ask to speak to Plaintiff outside the presence of the Hearing Panel to avoid prejudicing the Hearing Panel against Plaintiff.

145.    Mr. Adele did not respond.

146.    Instead, Mr. Adele called the Public Safety Officers while walking in and out of Room 3B, where the Hearing Panel was.

147.    Plaintiff, his father, and Plaintiff's advisor then walked towards the elevator, where they were confronted by another member of the Manhattan College Staff who loudly asked if they were headed to speak to Public Safety Officers.

148.    As they exited the elevator, they were confronted with two detectives with their badges exposed along with a Public Safety Officer.

149.    Only after Plaintiff's advisor asked them to leave the area to avoid further inappropriate exposure of the Hearing Panel did all parties exit the area.

150.    Plaintiff was then brought to the precinct and released without criminal charges.

151.    As the Chief Compliance Officer, Mr. Adele was charged with maintaining a fair and unbiased hearing for all parties.

152.    Mr. Adele's actions plainly violated his duties.

153.    Mr. Adele's statements at the end of the Hearing and his phone conversations with public safety in front of the Hearing Panel demonstrated Mr. Adele's clear bias against the Plaintiff.

154.    Mr. Adele's actions severely hampered a fair and impartial review of the evidence by the Hearing Panel.

155.    Mr. Adele's statements coupled with the actions of the detectives and Public Safety Officers in arresting Plaintiff immediately following the hearing and in close proximity to the Hearing Panel created potential and/or actual bias on the part of not only Mr. Adele, but on the part of the Hearing Panel.

156.    Additionally, at the end of the Title IX Hearing, Pichardo informed both parties that they would be informed of the outcome of the hearing. Pichardo never made any mention of or request for an impact statement.

157.    Following the Hearing, Pichardo failed to reach out to Plaintiff to offer him an opportunity to submit an impact statement.

158.    Instead, the Hearing Panel based its determination solely on the impact statements provided by Roe without any consideration for Plaintiff.

**VIII.    The Hearing Panel's Rationale for a Finding of Responsibility Was Based on Confounding Intoxication and Incapacitation**

159.    On December 19, 2022, Plaintiff received the Outcome Letter, which found him responsible for sexual assault, and sanctioned him to expulsion.

160.    The rationale included in the Outcome Letter, however, was devoid of any sound reasoning.

161.    Worse, the Outcome Letter ambushed Plaintiff and found him responsible of *new* allegations, of which he was never informed.

162.    Indeed, despite Roe's Title IX complaint claiming that Plaintiff forcibly sexually assaulted her, and making no claim of incapacitation, *the Hearing Panel proceeded to find Plaintiff responsible based on a theory of Roe's incapacitation.*

163.    In reaching the determination, however, the Hearing Panel noted that Roe was "intoxicated," and concluded that Roe was unable to consent.

164.    Importantly, the Hearing Panel *did not state that Roe was incapacitated,* but found that Roe was unable to consent solely due to her *intoxication*.

165.    The Hearing Panel therefore simply and improperly decided that **intoxication equals incapacity**.

166.    Indeed, the evidence elicited at the hearing indicated that Roe was *not incapacitated* during the evening in question. By way of example, and not limitation:

    a.  Roe engaged in detailed conversations about school, was steady on her feet, not slurring her words, able to navigate going from the fraternity to her home and back again without assistance, and recalled events in question (including admitting at the hearing for the first time that she asked the Plaintiff to engage in oral sex).

    b.  Neither Witness J.B.  nor J.R. saw Roe falling over, vomiting, or speaking incoherently.

    c.  J.B. and J.R. both testified that Roe did not appear overly drunk.

    d.  Plaintiff recalled three times that Roe was significantly more drunk than she was on September 2nd.

    e.  Plaintiff did not see Roe vomiting, falling down, slurring her words or acting in any other manner that would indicate that she was too intoxicated to give consent.

167.    Plaintiff did not know where Roe lived and would not have been able to go there without Roe bringing him there. Plaintiff testified that Roe led him to her apartment by the hand.

168.    Therefore, there was no evidence to indicate that Plaintiff knew or reasonably should have known that Roe was so intoxicated as to be incapable of making a knowing decision as to whether to engage in sexual activity.

169.    Accordingly, the evidence, including the testimony of two eyewitnesses, demonstrate that Roe was fully capable to consent and make her own choices, and was not incapacitated.

170.    Additionally, the Hearing Panel found that Plaintiff and Roe were *equally* intoxicated prior to and during the alleged incident, yet the Hearing Panel found Plaintiff *solely* responsible, which is discriminatory on its face against Plaintiff, as the male accused.

171.    Notably, the Hearing Panel made no note of finding Plaintiff responsible based on a general theory of forcible sexual assault, as Plaintiff was notified of when he finally did receive Roe's formal complaint. Rather, Plaintiff was only found responsible based on a theory of incapacitation, which he was never notified of, and therefore never received a proper opportunity to defend against.

172.    On information and belief, the Hearing Panel came to this determination because the testimony elicited throughout the Title IX investigation clearly demonstrated that Plaintiff did not forcibly sexually assault Roe as Roe had originally claimed, and therefore the Hearing Panel sought to create new charges solely for the purpose of having Plaintiff found responsible as the male accused.

IX.       **The College Found Grounds for Appeal Then Without Explanation, and in Violation of the College's Policies, Reversed its Appellate Decision**

173.     Per the College's policies, either party has the right to appeal on the following grounds:

> (1) a party believes a procedural error substantially impacted the original finding or sanction; (2) a party has substantial new evidence, (3) a party feels that the sanction is substantially outside the scope or guidelines set by the Manhattan College Community Standards and Student and Faculty Code of Conduct or (4) a party believes that any member of the Title IX process (the Title IX Officer, investigators, hearing officer, and/or decision makers) had a conflict of interest or bias that impacted the outcome of the hearing.

174.     Plaintiff submitted his appeal on December 30, 2022, citing various procedural and substantive errors with the College's handling of the process.

175.     The College issued its first Written Determination of Appeal on January 18, 2023 (the "Appeal Determination"), finding that there were at least two grounds for appeal.

176.     First, that Mr. Adele's conduct immediately following the Title IX hearing of *inter alia* telling Plaintiff that Public Safety Officers needed to speak with him right in front of the Hearing Panel as this conduct may have "substantially impacted the outcome of the hearing panel."

177.     Second, the Appeal Panel found that the Hearing Panel's failure to allow Plaintiff to submit an impact statement "prior to the hearing panel decision and not after the responsibility and sanction were determined" would have substantially impacted the outcome  in terms of the sanction issued.

178.     Finally, the Appeal Panel found that the sanctions may have been excessive due to the Hearing Panel's failure to allow Plaintiff to provide an impact statement.

179.     On January 31, 2023, however, Pichardo inexplicably wrote to the parties advising that the Appeal Panel would reconvene "in order to issue a *new decision that includes the Appeal Panel's decision regarding the outcome of the appeal*."

180.    Pichardo stated that the parties would have until February 7, 2023 "to submit written statements to the Appeal Panel regarding the portions of the Respondent's appeal where the Appeals Panel found that there were grounds for appeal."

181.    Pichardo therefore reopened the appeals process to allow Roe to respond to Plaintiff's appeal.

182.    There is absolutely no basis in the Policy for the Appeal Panel to request supplemental appeal papers or to issue a second determination.

183.    In an unprecedented departure from the clear provisions of the College's policies, the Appeal Panel issued a Second Written Determination of Appeal dated February 14, 2023 ("Second Appeal Determination").

184.    The Second Appeal Determination concluded that while there were substantial procedural errors, "the procedural errors did not have any impact on the facts presented in the case, and therefore, although the Respondent has grounds for Appeal, the Appeal Panel does not believe that this would have changed or altered the outcome of the hearing panel both in terms of responsibility and sanction. In conclusion, the responsibility and sanction remain unchanged."

### X.    AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT MANHATTAN COLLEGE

185.    Upon Plaintiff's matriculation to Manhattan College, Plaintiff and Manhattan College became mutually bound by the College's Title IX Policy (the "Policy").

186.    On information and belief, the Policy is updated and/or revised each new school year.

187.    The Policy and/or the various provisions contained therein are available online through the Manhattan College website.

188.    In response to local and federal pressure for failing to protect female accusers or taking a strong enough stance against sexual assault allegedly committed by males, Manhattan College applied the Policy in a manner that, on information and belief, resulted in harsher penalties for males accused of sexual misconduct as compared to females.[5]

189.    The Policy contains and represents a contract between students and the College, and, in particular, between Plaintiff John Doe and Defendant Manhattan College.

190.    Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome.

191.    The Policy states: "The Title IX Officer and/or her designee(s) will send written notice to both the Complainant and the Plaintiff (the individual(s) accused of the Title IX offense) of the allegations described in the formal complaint."

192.    The Policy further states: "The Plaintiff will receive a notice of investigation that includes the date time, location and factual allegations concerning the report that the College has received. Plaintiffs will also be provided with a reference to the specific code of conduct provisions alleged to have been violated."

193.    The College breached the Policy by failing to provide Plaintiff with a written Notice of Allegations upon receipt of Roe's complaint against Plaintiff. Instead, the first communication that Plaintiff received was on September 12, 2022, requesting an interview with Plaintiff. The

---

[5] Manhattan College has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

email did not detail the date, time, location, any underlying detail, or the specific Policy provisions which were allegedly breached.

194.    The College further breached the Policy by failing to notify Plaintiff that he was being investigated under a theory of Roe's incapacitation. Plaintiff was therefore found responsible for allegations which he was never notified of.

195.    The Policy states: "Each party has the right to bring one advisor of their choice to the hearing. If a party does not have an advisor, the College will appoint one, without fee or charge to the party. The advisor, may, but is not required to be, an attorney."

196.    The College breached the Policy by failing to inform Plaintiff of his right to have an advisor present prior to his initial interview.

197.    The Policy states: "Manhattan College will not tolerate retaliation. Retaliation is prohibited by Title IX. Any attempt by a member of or visitor to the Manhattan College community to intimidate, penalize, or threaten a person who reports or who is otherwise involved or cooperating in, a report of discrimination, misconduct, or harassment is strictly prohibited. Any person found to have participated in an act of retaliation will be disciplined accordingly."

198.    The College breached the Policy by failing to discipline Roe in any way for her retaliation against Plaintiff in distributing cards calling Plaintiff a rapist and intimidating witnesses against testifying in the Title IX proceeding.

199.    The Policy states: "After the hearing, but before the hearing officer delivers his/her written determination of responsibility and sanction, if any, the parties will have the opportunity to submit an impact statement for the hearing officer's consideration with regard to sanction."

200.    The College breached the Policy by failing to give Plaintiff an opportunity to submit an impact statement for the Hearing Officer's consideration following the Hearing.

201.    The Policy states:

Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity…

***

Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. **Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.** (emphasis added)

***

An individual who engages in sexual activity with someone the individual knows or reasonably should know is incapable of making a knowing, reasonable decision about whether to engage in sexual activity is in violation of this Policy.

202.    The College breached the Policy by finding that Roe was unable to consent to the alleged sexual activity due to her *intoxication*, while failing to make note of any indications of incapacitation. The Policy makes clear that intoxication does not automatically equate to incapacitation and therefore, an individual may still be able to consent to sexual activity while intoxicated.

203.    The Policy states that there are three grounds for appeal: "(1) a party believes a procedural error substantially impacted the original finding or sanction; (2) a party has substantial new evidence, (3) a party feels that the sanction is substantially outside the scope or guidelines set by the Manhattan College Community Standards and Student and Faculty Code of Conduct or (4) a party believes that any member of the Title IX process (the Title IX Officer, investigators, hearing officer, and/or decision makers) had a conflict of interest or bias that impacted the outcome of the hearing."

204. The College breached the Policy by failing to accept and consider Plaintiff's appeal, despite finding that there were grounds for appeal.

205. The Policy further states: "*All appellate decisions are final*." (emphasis added).

206. The College breached the Policy by *overturning* original appellate decision finding that Plaintiff had proper grounds to appeal, and reopening the appeals process to allow Roe to submit an opposition to Plaintiff's appeal.

207. The College further breached the Policy by then reversing its original appeal decision, and finding that Plaintiff's appeal did not present any grounds which could have impacted the outcome of the proceeding.

## XI.     N.Y. Education Law Article 129-B

208. On July 7, 2015, the New York State Governor signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* N.Y. Educ. L. § 6438 *et seq.*

209. Art. 129-B applies to "any college or university chartered by the regents or incorporated by special act of the legislature that maintains a campus in New York," including Manhattan College. *See* N.Y. Educ. Law 6439(1). It mandates that all such institutions, including Manhattan College, adopt certain rules and procedures in connection with their sexual misconduct policies.

210. Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute. If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate. Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

211.    Art. 129-B sets forth a standard of care with which colleges, including Manhattan College, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

212.    In the instant case, Manhattan College and its agents and employees breached their duty of care to Plaintiff as an enrolled student subject to disciplinary proceedings governed by Art. 129-B. As a result of this breach, Plaintiff suffered damages including loss of future educational and career opportunities.

213.    Art. 129-B mandates that all New York State institutions of higher education, including Manhattan College, "shall ensure" that every student be afforded the following rights:

> a.    The right "to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the respondent, including the right to a presumption that the respondent is 'not responsible' until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures";
>
> b.    The right "to an investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest";
>
> c.    "Access to at least one level of appeal of a determination before a panel, which may include one or more students, that is fair and impartial and does not include individuals with a conflict of interest"; and
>
> d.    The right "to make an impact statement during the point of the proceeding where the decision maker is deliberating on appropriate sanctions."

*See* N.Y. Educ. L. § 6444.

214.    The College violated these rights, as guaranteed by Article 129-B, by: (i) failing to conduct a thorough and impartial investigation into Roe's claims against Plaintiff, (ii) failing to afford Plaintiff the presumption of innocence; (iii) failing to provide Plaintiff with proper notice; and (iv) failing to allow Plaintiff to submit an impact statement regarding sanctions.

## XII.     <u>Plaintiff's Damages</u>

215.     As a direct and proximate result of Defendant's biased, illegal, and improper conduct, Plaintiff has been expelled when he was six credits shy of graduating, an erroneous finding that Plaintiff engaged in nonconsensual sexual intercourse has been made a part of Plaintiff's educational records and a notation has been made on his records and transcript. These records will be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to a graduate school or to secure future employment. Plaintiff has already applied to doctorate and masters programs in History.

216.     Plaintiff was selected as a Fulbright Study/Research Semi-Finalist representing Manhattan College and the United States in Morocco. It is extremely likely that Plaintiff would have been awarded the Fulbright Fellowship, as there were fourteen final applicants for ten positions. Additionally, Plaintiff prepared a substantial project that will be considered for the prestigious Fulbright National Geographic Storytelling Fellowship.

217.     Roe's allegations painted Plaintiff as a dangerous sex criminal, wiping out a lifetime of hard work towards his college education and future career prospects.

218.     By improperly expelling Plaintiff and placing a notation on his transcript, Manhattan College has destroyed Plaintiff's future education and career prospects. Specifically, as a result of the College's actions, Plaintiff will be forced to disclose and explain to potential employers and any school to which he may opt to apply that he was expelled for sexual misconduct.

219.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which ruined his reputation and will permanently impact his future education and career prospects.

220.     Roe engaged in a campaign of retaliation against Plaintiff that Defendant allowed to go unchecked. Roe and her mother distributed cards stating "Plaintiff is a Rapist" again harming Plaintiff's reputation.

221.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

222.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

223.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, and the Sanction is listed on Plaintiff's transcript.

224.     Defendant's biased, illegal, and improper conduct have had a profoundly negative impact on Plaintiff's mental health.

225.     Plaintiff has suffered from numerous panic attacks, and his anxiety and depression have severely increased.

226.     Plaintiff has developed severe suicidal ideation and PTSD.

227.     Plaintiff is now receiving therapy twice a week and the dosage of his medications has greatly increased following the College's gross mishandling of the matter.

228.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, emotional damage, economic losses, and damages to his future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972**
**Erroneous Outcome**

229.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

230.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

231.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Manhattan College.

232.    On information and belief, Manhattan College receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

233.    Title IX is enforceable through a private right of action.

234.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b); 28 C.F.R. § 54.135(b).

235.    Title IX may be violated by a school's imposition of college discipline where gender is a motivating factor in the decision to discipline.

236.    Manhattan College engaged in gender bias in its Title IX proceedings. Plaintiff was innocent and wrongly found to have committed a violation of the College's policies, and gender bias was a motivating factor.

237.    Manhattan College failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint based upon, by way of example and not limitation:

    a.    Failing to provide Plaintiff with proper notice of the allegations against him;

    b.    Failing to provide Plaintiff with the possible sanctions to be imposed;

    c.    Failing to timely provide Plaintiff with proper notice of his right to an advisor;

    d.    Interviewing Plaintiff without an advisor and without providing notice of the allegations;

    e.    Failing to ask Roe questions that would negatively impact her credibility, such as those pertaining to her actions that indicated that she chose to take Plaintiff to her apartment, that she asked to perform oral sex on the Plaintiff, that she seemed lucid and coherent and that she consented to sexual activity with Plaintiff who specifically asked if it was ok;

    f.    Permitting the Compliance Officer to prejudice the Hearing Panel;

    g.    Failing to provide an Investigation Report that gave Plaintiff a proper opportunity to review the evidence to be used against him;

    h.    Failing to properly apply the preponderance of the evidence standard given the lack of evidence in the case and Roe's conflicting statements;

    i.    Improperly Equating intoxication with incapacitation in violation of the Policy;

    j.    Failing to allow Plaintiff to submit an impact statement prior to issuing sanctions;

    k.    Reversing their Appeal Determination without any grounds in the Policy for doing so.

238.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous finding and the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

    a.    The pressure imposed by OCR investigations issued to address lack of Title IX compliance, including the fear of loss of federal funds as well as the fear

of added financial liability such as reimbursing tuition for aggrieved students if the College was not compliant;

b.  Internal pressure from the student body and media to aggressively pursue complaints of sexual misconduct against males and to believe all women in cases of sexual assault regardless of the evidence;

c.  Failing to provide Plaintiff with a Notice of Allegation and failing to timely advise Plaintiff of his right to an advisor;

d.  Conducting blatantly biased interviews and failing to elicit information that could be exculpatory for Plaintiff;

e.  Failing to address Roe's retaliatory behavior and witness tampering;

f.  Failing to ask Roe questions that would negatively impact her credibility;

g.  Improperly Equating intoxication with incapacitation in violation of the Policy;

h.  Finding Plaintiff and Roe were *equally* intoxicated, yet finding that Roe was unable to consent due to intoxication, while not finding the same with regard to Plaintiff;

i.  Defendant's reopening of the appeal's process to allow Roe an opportunity to oppose Plaintiff's appeal after the deadline had already passed;

j.  Defendant's distortion of the evidence and of Plaintiff's statements to fit Roe's narrative, rather than impartially evaluating the facts of the case; and

k.  Defendant's refusal to apply the particular facts of the case in considering the appropriate sanction, including the fact that Roe had already transferred schools and that Plaintiff was six credits shy of graduating.

239.  On information and belief, Manhattan College's mishandling of the complaint was informed by institutional pressure, ongoing OCR investigations into noncompliant colleges and universities, and the threat of rescission of federal funds.

240.  On information and belief, Manhattan College has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students,

while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

241.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

242.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to, severe emotional damages, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

243.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Manhattan College to: (i) reverse the outcome, findings, and sanctions regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Breach of Contract**

244.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

245.    At all times relevant hereto, a contractual relationship existed between Plaintiff and Manhattan College through Manhattan College's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other consideration, such as compliance with the College's relevant policies.

246.     Manhattan College committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Roe's allegations against him, including but not limited to:

      a.      Failing to provide Plaintiff with a Notice of Allegation;

      b.      Failing to timely advise Plaintiff with proper information regarding his right to the advisor of his choice;

      c.      Failing to distinguish between intoxication and incapacitation as set forth in the Policy;

      d.      Permitting the Compliance Officer to prejudice the Hearing Panel, and refusing to consider this as a bias/conflict of interest that affected the outcome of the proceeding on appeal;

      e.      Improperly Equating intoxication with incapacitation in violation of the Policy; and

      f.      Overturning the original appeal decision.

247.     Further, included in these contractual agreements is the covenant of good faith and fair dealing implied in all contracts. *Ccr Int'l v. Elias Grp.*, 2021 U.S. Dist. LEXIS 68169, at *13 (S.D.N.Y. Apr. 5, 2021).

248.     The implied covenant of good faith and fair dealing "includes promises that a 'reasonable person in the position of the promisee would be justified in understanding were included' in the contract and, when the contract involves the exercise of discretion, a promise 'not to act arbitrarily or irrationally in exercising that discretion.'" *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995)).

249.     Manhattan College breached the covenant of good faith and fair dealing implied in the Policy. Examples of such breach include, but are not limited to:

      a.      The Investigators abused their discretion by failing to ask probing questions to witnesses, including Roe, in order to paint a narrative that led Plaintiff to be found responsible;

b.    The Investigators failed to properly inform Plaintiff of all relevant procedural information, such as the role of his advisor;

c.    Failing to address Roe's retaliatory behavior and witness tampering;

d.    Permitting the Compliance Officer to prejudice the Hearing Panel;

e.    Failing to properly apply the preponderance of the evidence standard given the lack of evidence in the case and Roe's conflicting statements;

f.    The Hearing Panel abusing its discretion by implementing an unduly harsh sanction that did not consider the specific facts of the case; and

g.    The Appeal Panel requesting supplemental appeals and then reversing their Appeal Determination in a Second Determination in violation of the Policy.

250.    As a proximate and foreseeable consequence of the foregoing, Plaintiff sustained damages, including, but not limited to, severe emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

251.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant as follows:

(i)    On the first cause of action for Violation of Title IX of the Education Amendments of 1972 Erroneous Outcome, a judgment against Manhattan College awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Manhattan College to: (i) reverse the outcome, findings, and sanctions regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational

file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(ii)    On the second cause of action for Breach of Contract, a judgment against Manhattan College awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:   **New York, New York**
         **March 1, 2023**

                              **Respectfully submitted,**

                              **NESENOFF & MILTENBERG, LLP**
                              *Attorneys for Plaintiff John Doe*

                              **By: /s/Andrew T. Miltenberg**
                               **Andrew T. Miltenberg, Esq.**
                               **Stuart Bernstein, Esq.**
                               **Helen Setton, Esq.**
                               **Kristen Mohr, Esq.**
                               **363 Seventh Avenue, Fifth Floor**
                               **New York, New York 10001**
                               **212-736-4500**
                               **amiltenberg@nmllplaw.com**
                               **sbernstein@nmllplaw.com**
                               **hsetton@nmllplaw.com**
                               **kmohr@nmllplaw.com**